# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville December 18, 2013

## STATE OF TENNESSEE v. GABRIEL TORRES

**Direct Appeal from the Circuit Court for Robertson County**
No. 2011-CR-659      Michael R. Jones, Judge

———————————

**No. M2013-00765-CCA-R3-CD - Filed August 21, 2014**

———————————

A Robertson County Circuit Court Jury convicted the appellant, Gabriel Torres, of rape of a child, a Class A felony, and the trial court sentenced him to twenty-five years in confinement to be served at 100%. On appeal, the appellant contends that the evidence is insufficient to support the conviction and that the trial court failed to fulfill its role as the thirteenth juror. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and ROGER A. PAGE, J., joined.

Roger E. Nell (on appeal), Clarksville, Tennessee, and Timothy Richter (at trial), Springfield, Tennessee, for the appellant, Gabriel Torres.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In November 2011, the Robertson County Grand Jury indicted the appellant for three counts of rape of a child. Count 1 alleged that the appellant raped the victim at the victim's mother's house in the victim's brother's bedroom; count 2 alleged that the appellant raped the victim at his house in his bedroom; and count 3 alleged that the appellant raped the victim at her grandmother's house while the victim was "outside on a big caterpillar bungee yard

toy." According to the original indictment, count 1 occurred between August 1, 2008, and May 31, 2009. The indictment did not provide dates for counts 2 and 3. However, on the morning of trial, the trial court allowed the State to amend the indictment for all three counts, alleging that the offenses occurred between May 1, 2007, and August 31, 2009. Shortly thereafter, the State elected to dismiss count 3.

The then eleven-year-old victim testified at trial that she was born on April 10, 2001, and was in the sixth grade. She said that the appellant was her uncle and that she had known him "[s]ince [she] was little." The State showed the victim an anatomically-correct picture of a girl, and she identified the "chest," "crotch," and "butt" as a girl's "private parts." The State showed the victim an anatomically-correct picture of a boy, and she identified the "penis" and "butt" as a boy's "private parts." She acknowledged that touching a person's private parts constituted a "bad touch."

The victim testified that the first incident with the appellant occurred at her home in Springfield during a first communion party for her brother and sisters. The State asked the victim how old she was at the time, and she answered, "Like six." The victim said that everyone was outside and that she went inside the house with the appellant to show him the bathroom. Instead of going into the bathroom, the appellant told the victim to pull down her pants, and he pulled down his pants. The victim said that she saw the appellant's private part and that it was "long" and "round." She said that the appellant put his private part inside her private and that it did not feel good. The victim acknowledged that the appellant put his private into her crotch. She said that the appellant's penis "felt gooey" and that she could not remember if she felt pain.

The victim testified that the incident happened in the hallway outside the bathroom and that she and the appellant were standing. She was leaning against the wall, and he was facing her. The appellant pulled his penis out of her crotch, told her to pull up her pants, and told her not to say anything to anyone. He then went into the bathroom, and the victim went outside to her mother. She said she did not tell anyone because she was scared "he might do something."

The victim testified that the second incident occurred at the appellant's trailer. Prior to the incident, the victim had been playing outside at her home. The appellant approached the victim and asked if she wanted to go to the store with him. The victim told him that she would have to ask her mother. The appellant went inside the house, came outside, and told the victim that her mother had said she could go with him. The appellant took the victim to the store and bought a bag of candy for her and a bottle of beer for himself. They left the store, and the appellant told the victim that he had to stop by his house. When they got there, the victim went inside the trailer with him. The appellant told the victim to come into his

bedroom and lie on his bed. The victim did as she was told.

The victim testified that the appellant went into the bathroom and came out holding a piece of toilet paper. He told the victim to pull down her pants, and he pulled down his pants. She said that she saw his private part and that it was "long, round and wrinkly." The appellant put his private part into her crotch. She described his private part as "squishy" and said that it hurt. The appellant took his penis out of her crotch, and something white came out of his penis. She said that the appellant wiped his penis with the toilet paper, that he put his penis back into her crotch, and that "[i]t [felt] wet." Someone knocked on the front door of the trailer, so the appellant took his penis out of the victim, pulled up his pants, and left the bedroom to answer the door. The victim said that she heard the appellant talking with someone and that the person left. The appellant returned to the bedroom, told the victim to pull up her pants, and told her not to tell anyone. Then he took her home. She said that the second incident may have happened one year after the first incident.

The victim testified that she was bilingual and that the appellant spoke to her in Spanish. She said that when she was in the fifth grade, her guidance counselor taught her class about cyberbullying and "good touches and bad touches." The victim decided to tell her guidance counselor about the abuse.

On cross-examination, the victim acknowledged that the first incident occurred during a large party with more than twenty people present and that she and the appellant were standing. Defense counsel asked the victim if she knew how tall she was, and the victim said, "Four [feet] something." The victim also acknowledged talking to a female interviewer about the incidents. She said that she did not remember telling the interviewer that she was eight or nine years old at the time of the first incident, that she came out of the bathroom to find the appellant waiting on her in the hallway, or that the first incident occurred in her brother's bedroom while she was lying on her brother's bed.

At that point, defense counsel requested a "jury out for a minute," and the trial court sent the jury out of the courtroom for a break. During the break, defense counsel advised the trial court that the victim's interview at the Child Advocacy Center (CAC) had been video-recorded and asked to play the interview for the jury. In response, the State requested that the entire interview, in which the victim had described all three rapes, be played. Defense counsel did not object and played the entire video for the jury when it returned to the courtroom. When cross-examination resumed, and the victim acknowledged telling the interviewer that she was eight or nine years old at the time of the first incident, that the appellant was waiting for her in the hallway when she came out of the bathroom, and that the appellant came into her brother's bedroom while she was on her brother's bed. She also acknowledged telling the interviewer that the appellant grabbed some toilet paper during the

-3-

first incident and that white "stuff" came out of his penis. She said that she was certain the first incident occurred when she was in the second grade, that she thought it happened in 2006, and that her mother, father, brother, sisters, aunt, and grandmother were at the communion party. She acknowledged that she did not tell the interviewer that someone knocked at the front door during the incident at the trailer.

On redirect examination, the victim testified that she remembered the first incident as she had described it for the jury. She stated that a third incident occurred at her grandmother's house the day after one of her cousins had a birthday. The victim and two of her cousins were playing on a large inflatable in the back yard, and the adults were inside her grandmother's home. While the victim's cousins were playing on one end of the inflatable, the victim was playing on the other end, and they could not see each other. The appellant arrived and told the victim to pull down her pants. She said that she tried to climb the slide and leave but that she slipped and the appellant grabbed her. He pulled his private part out of his pants and put it into her private part. She said that it hurt and that the appellant told her cousins to stay where they were. The appellant took his private part out of the victim, told her to pull up her pants, and told her not to tell anyone. On recross-examination, the victim testified that ten people were at her grandmother's house during the third incident.

Tory Sherer testified that she was a counselor at the victim's elementary school for the 2011 to 2012 school year. Sherer said that at some point, she taught a class to the fifth grade students in which she told them about their "private areas" and that they should let her know if they had been touched inappropriately. At the end of the class, Sherer noticed that the victim had tears welling in her eyes. The victim walked up to Sherer, and Sherer asked her what was wrong. After the other students left, the victim told Sherer that a man had touched her inappropriately. Sherer asked the victim to identify the man, and the victim said that "we call him my uncle but I know he's not, but I don't know his name." Sherer asked the victim where the man had touched her, and the victim said that he had touched "her top half and her bottom half." Sherer did not ask the victim anything else and notified the Department of Children's Services (DCS). Sherer said that during her conversation with the victim, the victim was "just bawling" and that they had to "take a few seconds" numerous times. On cross-examination, Sherer testified that the victim pointed to the victim's breasts and vaginal area.

Abilene Hernandez, the victim's twenty-one-year-old sister, testified that the appellant was her grandmother's cousin and that "we consider him our uncle." She said that her family members had known him since they came to the United States from Mexico in 1999 and that he and his wife attended her family's parties. The children in the family played with the appellant and would go to the store with him sometimes. In 2007 or 2008, Hernandez's mother and grandmother helped the appellant's wife cook and clean because she had breast

cancer, and the two families never experienced any conflict. In May 2007, Hernandez's family had a first communion party at the family's home. Hernandez recalled that her family also had a birthday party for her two cousins at her grandmother's house, and she thought the birthday party occurred in August 2009. The family rented a large caterpillar "jumpy" for the birthday party. The day after the party, the inflatable was still there, and some of the children played on it. The appellant attended the birthday party, but Hernandez could not remember if he was at her grandmother's house the next day. She said the victim was trustworthy.

On cross-examination, Hernandez testified that about twenty people attended the communion party. The family cooked the food for the party inside the house but took the food outside to eat. If people needed to use the bathroom, they had to go inside the house. Hernandez said the caterpillar inflatable rented for the birthday party was large enough to be seen from her grandmother's house. Hernandez acknowledged that she and the victim had a close relationship and that she loved the victim.

Maria Ambriz, the victim's mother, testified through an interpreter that the victim currently lived with Ambriz's mother and daughter, Abiliene Hernandez. She said that she had known the appellant "a whole lot of years" and that her children referred to him as "Gabby" or "uncle." She said the victim loved the appellant because he was part of the family.

Ambriz testified that she spent time with the appellant's wife in 2006 or 2007 because the appellant's wife had breast cancer. At some point, Ambriz's family hosted a communion party at home for Ambriz's three oldest children. The appellant and the victim attended the party, which was outside. Ambriz recalled that a birthday party for her two nieces occurred at her mother's home and that a caterpillar inflatable was rented for the party. Ambriz said the birthday party occurred in August, but she could not remember the year.

On cross-examination, Ambriz testified that the victim currently lived with the Ambriz's mother because Ambriz "wanted to bring some distance" between the victim and "this problem we have now." Ambriz denied that her children went to live with their grandmother because Ambriz had been accused of leaving them by themselves. She said that about sixteen people attended the communion party. She acknowledged that food was prepared inside her home for the party and that people took things in and out of the house throughout the party. She said that the caterpillar inflatable rented for the birthday party was not too far from her mother's home but that the inflatable could be seen only from her mother's bedroom window.

On redirect examination, Ambriz clarified that the best place from which to have seen

the inflatable was her mother's bedroom window. Although the back of her mother's home had additional windows, they were covered by curtains. At the conclusion of Ambriz's testimony, the State rested its case.

Brenda Bomar testified for the appellant that she had known him for fifteen years and that he was a family friend. She described him as a "great guy" and said that he had interacted with her two children. The appellant babysat Bomar's children while Bomar took his wife to appointments for breast cancer, and Bomar did not have any reservations about leaving her children with him. Bomar had never seen the appellant exhibit violence or inappropriate behavior toward children.

Dimetria Real testified through an interpreter that she had known the appellant for ten years and considered him to be her husband. She said that the appellant was a good person, was a hard worker, and supported her and her family. The appellant had never exhibited any behavior toward children that would cause her concern.

On cross-examination, Real testified that she was treated for breast cancer about six years before the appellant's trial and that the victim's family visited her. However, as far as helping her, she said that "it was basically [the appellant]."

The jury acquitted the appellant of count 1, raping the victim at the communion party, but convicted him of count 2, raping the victim in his bedroom, a Class A felony. After a sentencing hearing, the trial court sentenced him to twenty-five years in confinement to be served at 100%.

## II. Analysis

On appeal, the appellant claims that the evidence is insufficient to support the conviction and that we must vacate the conviction and remand the case for a new trial because the trial court failed to fulfill its role as the thirteenth juror. However, the judgment of conviction was entered and filed on December 11, 2012, but the appellant did not file his motion for new trial until thirty-one days later on January 11, 2013. Subsequently, the trial court dismissed the late-filed motion on the basis that it no longer had jurisdiction over the case. See Tenn. R. Crim. P. 33(b) (providing that in a case tried by a jury, a motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered"). "If a motion for new trial is not timely filed, all [the appellant's] issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997)). Therefore, the appellant's thirteenth juror issue has been waived.

The State claims we should dismiss the appeal because the appellant's notice of appeal also was untimely. The trial court dismissed the late-filed motion for new trial on February 22, 2013, and the appellant filed his notice of appeal on March 20, 2013. However, because a late-filed motion for new trial does not toll the time for filing a notice of appeal, an untimely motion for new trial usually results in an untimely notice of appeal. The appellant has requested that this court waive the timely filing of the notice of appeal. Rule 4 states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). We have chosen to waive the timely filing to address the appellant's sufficiency claim.

The appellant contends that the evidence is insufficient to support the conviction because the only evidence against him was the victim's testimony. He claims that the victim's testimony regarding the rape at his trailer was not credible because the jury disbelieved her testimony regarding the rape at the communion party and because her testimony about the rape on the inflatable was "beyond belief." The State argues that the evidence is sufficient. We agree with the State.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012); see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See Wagner, 382 S.W.3d at 297; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. See Wagner, 382 S.W.3d at 297; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. See Wagner, 382 S.W.3d at 297; Cabbage, 571 S.W.2d at 835.

As charged in this case, rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn.

Code Ann. § 39-13-501(7).

The victim testified that after the appellant took her to the store, he took her to his trailer. She went into the trailer and his bedroom with him, and he told her to lie on the bed. The appellant went into the bathroom and came out holding a piece of toilet paper. He told the victim to pull down her pants, and he pulled down his pants. The victim said she saw his penis, which she described as "long, round and wrinkly." She said that the appellant put his penis inside her crotch and that it hurt. She said that the appellant took his penis out of her crotch, that white stuff came out of his penis, that he wiped his penis with the toilet paper, and that he put his penis back into her crotch. She said that when someone knocked at the front door, the appellant took his penis out of her crotch, pulled up his pants, and left the room. Although the appellant contends that the victim is not credible, determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury obviously resolved the issue of credibility regarding count 2 in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, we conclude that the evidence is sufficient to support the appellant's conviction of rape of a child.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-8-